UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RAPDEV LLC, | * |
| Plaintiff, | * |
| v. | * Civil Action No. 24-cv-11142-ADB |
| NICHOLAS VECELLIO, ANTHONY YOUNES, NOBS LLC, | * |
| Defendants. | * |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

RapDev LLC ("Plaintiff" or the "Company"), a technical consulting company, filed this action against former employees Nicholas Vecellio ("Vecellio") and Anthony Younes ("Younes") and their business NoBS LLC ("NoBS") (collectively, the "Defendants"), alleging, among other things, theft of trade secrets, breaches of contract, and tortious interference with contractual relations. Currently before the Court is Plaintiff's motion to dismiss Defendants' Counterclaim Complaint. [ECF No. 11]. For the foregoing reasons, the motion to dismiss is **GRANTED** without prejudice.

I.     BACKGROUND

   A.     Factual Background

The following facts are primarily drawn from the Counterclaim Complaint, [ECF No. 9 at 8–15 ("Counterclaim Complaint" or "Countercl. Compl.")], and the documents attached thereto,

1

and are taken as true for the purpose of resolving the Company's motion to dismiss.  See Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

The Company is a technical consulting business that assists its vendor, the software company Datadog, by "help[ing] [Datadog's] customers install and improve the performance of Datadog's cloud monitoring and security products."  [ECF No. 1 ¶ 16; Countercl. Compl. ¶ 23].  Datadog sells "observability software," which is "a broad category of product [sic] that is designed to enhance the ability of enterprises to oversee the performance of their software and their enterprises using a variety of real time metrics for the purpose of enhancing productivity and decreasing waste and delay."  [Countercl. Compl. ¶ 21].  On its website, Datadog "has a long and public list of Partners [] to whom [it] refer[s] business of various kinds."  [Id. ¶¶ 24–25].

In October 2021, the Company hired Vecellio for the position of DevOps Architect.  [Countercl. Compl. ¶ 1; ECF No. 9-1 ("Employment Contract")].  Vecellio "was in frequent contact with Datadog and provided services prior to any relation with [the Company]."  [Countercl. Compl. ¶ 31].  As relevant here, the Employment Contract included a non-competition clause, which provided that during his employment and for a period of one year thereafter, Vecellio would not, directly or indirectly:

> a. Induce or attempt to induce any employee or contractor of the Employer to quit employment or retainer with the [Company];
>
> b. Otherwise interfere with or disrupt the [Company's] relationship with its employees and contractors;
>
> c. Discuss employment opportunities or provide information about competitive employment to any of the [Company's] employees or contractors; or
>
> d. Solicit, entice, or hire away any employee or contractor of the [Company] for the purpose of an employment opportunity that is in competition with the [Company].

[Employment Contract ¶ 24].

The Employment Contract further stated that while employed and for a period of one year after the termination of the employment, Vecellio would not "divert or attempt to divert from the [Company] any business the [Company] had enjoyed, solicited, or attempted to solicit, from its customers." [Employment Contract ¶ 26].

In March 2022, the Company hired Younes as a Senior Sales Executive. [Countercl. Compl. ¶ 5]. He had six years of prior experience in the sales and marketing of so-called "observability software" and "was aware of and competed against Datadog for as many as six years before he had any association with [the Company]." [Id. ¶¶ 6, 32].

In summer 2023, Younes and Vecellio were dissatisfied with the Company and in September 2023 began discussing the possibility of forming a consulting organization. [Countercl. Compl. ¶¶ 8–9]. Shortly thereafter, Younes and Vecellio engaged counsel to assist them with establishing such an organization. [Id. ¶ 10].

Vecellio gave his one month notice to the Company in mid-October 2023; Younes gave his two week-notice in late October 2023. [Countercl. Compl. ¶¶ 11–12]. The Separation Agreement between Younes and the Company contained a non-solicitation clause, which stated that:

> For the twenty four (24) month period following the Separation Date, Employee will not, either directly or through others, (i) solicit or attempt to solicit for hire, or hire, any employee of the Company or any person who was employed by the Company within the six (6) month period immediately prior to such solicitation or hire; or (ii) solicit any consultant, contractor, collaborator, vendor or customer of the Company, with whom Employee had contact or whose identity Employee learned of as a result of employment with the Company to diminish or alter in any way its relationship with the Company. For purposes of this Agreement, a "customer" is any person or entity to which the Company has provided goods or services at any time during the period commencing six (6) months prior to Employee's employment with the Company and ending on the Separation Date.

[ECF No. 9-3 ("Separation Agreement") ¶ 10].

On November 13, 2023, after Younes and Vecellio had left the Company, NoBS was incorporated. [Countercl. Compl. ¶¶ 11–13]. NoBS applied to become a Partner of Datadog and was accepted by Datadog on November 21, 2023. [Id. ¶ 14]. "In order to be sure that their contractual obligations were observed, NoBS positioned itself not only to perform work that [the Company] did not do, but work that [the Company] expressed public[ly] an intention to avoid." [Id. ¶ 15]. NoBS' services consisted of "the implementation of software . . . in the very short term and limited frame of 0–30 days," which was an area not covered by the Company. [Id. ¶¶ 15–17, 27–28, 34].

On January 12, 2024, after a LinkedIn post announced the creation of NoBS on January 8, 2024, the Company sent NoBS a cease-and-desist letter. [Countercl. Compl. ¶ 19; ECF No. 9-5 (the "Cease-and-Desist Letter")]. The Cease-and-Desist Letter "remind[ed] [Defendants] of [their] continuing obligations to the Company, pursuant to the restrictive covenants contained in [their] agreements and Massachusetts law," and "demand[ed] that [they] immediately cease and desist all conduct violative of those agreements and Massachusetts law" and "return the Company's confidential and proprietary information." [Cease-and-Desist Letter at 3].

On February 7, 2024, Datadog's Regional Vice President ("Regional Vice President") sent an email to Younes and two individuals with Datadog email addresses, in which he said that NoBS "will focus on filling the gaps of [the Company] such as offering shorter duration services." [ECF No. 9-6 at 2]. The Regional Vice President further wrote, "Let's make sure [Datadog's] sellers are aware of NoBS and the options they now have to deliver short term services including hands on key work!!!!" [Id.].

4

### B.    Procedural History

The Company initiated this action on April 29, 2024.  [ECF No. 1].  On May 22, 2024, Defendants (or "Plaintiffs-in-Counterclaim") filed their Answer and Counterclaim Complaint.  [ECF No. 9].  On June 7, 2024, the Company (or "Defendant-in-Counterclaim") filed its motion to dismiss the Counterclaim Complaint, [ECF Nos. 11–12], and Plaintiffs-in-Counterclaim opposed on June 24, 2024, [ECF No. 15].

## II.    DISCUSSION

On a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pled facts, analyze those facts in the light most favorable to the plaintiff-in-counterclaim's theory, and draw all reasonable inferences from those facts in favor of the plaintiff-in-counterclaim.  See U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).  While detailed factual allegations are not required, a counterclaim complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and it must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (citations omitted).  The facts alleged must be sufficient to "state a claim to relief that is plausible on its face."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 570).  Importantly, "a court may not look beyond the facts alleged in the [counterclaim] complaint, documents incorporated by reference therein and facts susceptible to judicial notice."  MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020).

When assessing the sufficiency of a counterclaim complaint, the Court first "separate[s] the [pleading's] factual allegations (which must be accepted as true) from its conclusory legal

allegations (which need not be credited).'" A.G. ex rel. Maddox, 732 F.3d at 80 (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Next, the Court "determine[s] whether the remaining factual content allows a 'reasonable inference that the [defendant-in-counterclaim] is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz, 676 F.3d at 224).

### A. Breach of Contract Claims (Counts I and II)

The Counterclaim Complaint's breach of contract allegations appear to key off the Company's initial complaint, which claims that Vecellio breached his Employment Contract and Younes his Separation Agreement.  Plaintiffs-in-Counterclaim seemingly argue that, by alleging that Vecellio and Younes breached their respective contracts, the Company itself violated the contracts.  [Countercl. Compl. ¶¶ 36–55].  In its motion the dismiss, the Company argues that Plaintiffs-in-Counterclaim have not sufficiently pled breach of contract, [ECF No. 12 at 4–5], and Plaintiffs-in-Counterclaim respond that dismissal is premature and that they are entitled to the benefits of their respective agreements, the deprivation of which constitutes a breach of contract and the covenant of good faith and fair dealing.  [ECF No. 15 at 3–4].

"Under Massachusetts law, a breach of contract claim requires the plaintiff[-in-counterclaim] to show that (1) a valid contract between the parties existed, (2) the plaintiff[-in-counterclaim] was ready, willing, and able to perform, (3) the defendant[-in-counterclaim] was in breach of the contract, and (4) the plaintiff[-in-counterclaim] sustained damages as a result." Bose Corp. v. Ejaz, 732 F. 3d 17, 21 (1st Cir. 2013) (citing Singarella v. City of Boston, 173 N.E.2d 290, 291 (Mass. 1961)).  A plaintiff-in-counterclaim "must do more than allege, in conclusory fashion, that the defendant[-in-counterclaim] breached the contract, by describing, with 'substantial certainty,' the specific contractual promise the defendant[-in-counterclaim]

6

failed to keep." Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007) (citation omitted).

In Massachusetts, furthermore, "[e]very contract implies good faith and fair dealing between the parties to it." Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991) (quoting Warner Ins. v. Comm'r of Ins., 548 N.E.2d 188, 193 n. 9 (Mass. 1990)). "The covenant of good faith and fair dealing provides that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.'" T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 704 (Mass. 2010) (quoting Anthony's Pier Four, Inc., 583 N.E.2d at 806). The "scope of the covenant is only as broad as the contract that governs the particular relationship." Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005). "As a consequence, the implied covenant cannot 'create rights and duties not otherwise provided for in the existing contractual relationship.'" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 238 (1st Cir. 2013) (quoting Ayash, 822 N.E.2d at 684).

Plaintiffs-in-Counterclaim's allegations do not carry the day. As to Count I, Plaintiffs-in-Counterclaim assert that the Company "attempted to prevent [Vecellio's] ability to make a future living with no basis in fact" and in reliance on "inaccurate recitations of the facts." [Countercl. Compl. ¶ 40]. They, however, do not specify the contractual provision the Company allegedly breached. Rather, Plaintiffs-in-Counterclaim assert that the Company's "attempt to fraudulently enforce breaches of [] Vecellio['s] [Employment] Contract constitute[s] a breach of contract and the covenant of good faith and fair dealing." [Id. ¶ 41]. Such conclusory statements are insufficient to survive a motion to dismiss.[1] Brooks, 480 F.3d at 586.

---

[1] To the extent Plaintiffs-in-Counterclaim allege that the Company breached the covenant of good faith and fair dealing by committing fraud, [Countercl. Compl. ¶¶ 41, 54], such a claim fails. Under Massachusetts law, to support this claim, Plaintiffs-in-Counterclaim must show

Count II is predicated, broadly speaking, on the same general premise, namely that Younes did not breach his Separation Agreement, as he "returned and gave up all materials associated with [the Company] pursuant to his obligations under the contract," [Countercl. Compl. ¶ 49], downloaded materials only in furtherance of his duties on the Company's behalf, [id. ¶ 50], and was "honest and upfront about his future endeavors and went to great lengths to ensure that he did not violate" the Separation Agreement, [id. ¶ 51]. Thus, Plaintiffs-in-Counterclaim contend that because Younes complied with the Separation Agreement's non-solicitation clause, the Company's action constitutes a breach of contract. [Id. ¶¶ 52–54]. Again, Plaintiffs-in-Counterclaim's allegations point to no contractual provision that the Company allegedly violated.[2] See [Counterclaim Compl. ¶¶ 43–55]; see also [ECF No. 15 at 4 (referring generally to the "expected benefits [the parties] negotiated under the agreement[s]," the deprivation of which are "a violation of the covenant or [contract]."). Accordingly, Counts I and II are dismissed.

---

"that the [Company] made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the [Plaintiffs-in-Counterclaim] to act thereon, and that the [Plaintiffs-in-Counterclaim] relied upon the representation as true and acted upon it to [their] damage." Danca v. Taunton Sav. Bank, 429 N.E.2d 1129, 1133 (Mass. 1982) (citation omitted). Here, the Counterclaim Complaint is devoid of any factual allegations indicating that Plaintiffs-in-Counterclaim were induced to act upon a false representation. See generally [Countercl. Compl.].

[2] Separately, the Court observes that both the Employment Contract and the Separation Agreement permit the Company to pursue legal action in the case of an alleged breach of contract. [Employment Contract ¶ 45 ("In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee agrees that the Employer is entitled to a permanent injunction, in addition to and not in limitation of any other rights and remedies available to the Employer at law or in equity . . . ."); Separation Agreement ¶ 6 ("All remedies at law or in equity shall be available to the [Company] for the enforcement of this Agreement.")]. Therefore, insofar Plaintiffs-in-Counterclaim imply that the decision to pursue legal action in itself constitutes a breach of the covenant of good faith and fair dealing, the Court finds the argument unavailing.

### B.     Intentional Interference with a Contractual Relationship (Count III)

To state a claim for intentional interference with a contractual relationship, Plaintiffs-in-Counterclaim "must show (1) that [they] had a contract with [Datadog], (2) that [the Company] knowingly induced [Datadog] to break that contract, (3) that [the Company's] interference was improper in means or motive, and (4) that [they] were harmed by the interference." Cachopa v. Town of Stoughton, 893 N.E.2d 407, 411 (Mass. App. Ct. 2008).  "Massachusetts courts will find the improper motive element met when a defendant[-in-counterclaim] exhibits 'actual malice or a spiteful, malignant purpose, unrelated to a legitimate corporate interest.'  On the other hand, the mere desire to benefit oneself or one's principal will not suffice." Hamann v. Carpenter, 937 F.3d 86, 90 (1st Cir. 2019) (first sentence quoting Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 43 (1st Cir. 2011) (internal quotation marks and brackets omitted); second sentence citing United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 24 (Mass. 1990)) (further citation omitted)).

The Company argues that Plaintiffs-in-Counterclaim fail to plead "the first three elements of the claim, and only vaguely allege resulting harm."  [ECF No. 12 at 5].  Relying primarily on the Regional Vice President's email, which explained that NoBS was offering new services, [ECF No. 9-6], Plaintiffs-in-Counterclaim reply that NoBS' services were not competing with the ones offered by the Company but instead filled an existing "serious need," [ECF No. 15 at 4–5].

Plaintiffs-in-Counterclaim's intentional interference claim fails.  Even assuming that NoBS and DataDog had entered into a contract, [Countercl. Compl. ¶ 57], which, based on the facts before the Court is by no means evident, [ECF No. 9-6], the Counterclaim Complaint is devoid of any allegations suggesting that "the Company knowingly induced Datadog to break

9

that contract" or that any purported interference was "improper in means or motive," see generally [Countercl. Compl.]. This is fatal to Count III and the Court need not go any further.[3] Thus, Count III is dismissed.

### C.  Unfair Trade Practices Claim (Mass. Gen. Laws ch. 93A, §§ 2, 11) (Count IV)

Under Count IV, Plaintiffs-in-Counterclaim assert that the Company's actions—that is, the alleged breach of the Employment Contract and Separation Agreement and the Cease-and-Desist Letter—constitute an unfair trade practice under Chapter 93A, §§ 2 and 11. [Countercl. Compl. ¶¶ 61–65]; Mass. Gen. Laws ch. 93A, §§ 2, 11. Specifically, Plaintiffs-in-Counterclaim claim that these actions "were undertaken to prevent the entry of NoBS and its principals into a marketplace in which they had an absolute right to participate," despite the fact that the Company knew that NoBS' partnership with Datadog was "permissible and limited." [Countercl. Compl. ¶¶ 62–63]. Defendant-in-Counterclaim argues that because Plaintiffs-in-Counterclaim "fail to allege that [the Company's] actions are anything more than an attempt to enforce Vecellio's and Younes's contractual obligations and further fail to establish that any breach of contract by [the Company] occurred in the first instance," Count IV must be dismissed. [ECF No. 12 at 7].

---

[3] Although unclear from the face of the Counterclaim Complaint, to the extent Plaintiffs-in-Counterclaim bring a claim of tortious interference with an advantageous business relationship, it would similarly fail. In Massachusetts, to plead this tort, Plaintiffs-in-Counterclaim must show that "(1) [they] had an advantageous relationship with a third party (e.g., a present or prospective contract or [business] relationship); (2) the [Company] knowingly induced a breaking of the relationship; (3) the [Company's] interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) [] [they] w[ere] harmed by the [Company's] actions." Hamann, 937 F.3d at 93 (second alteration in original) (quoting Blackstone v. Cashman, 860 N.E.2d 7, 12–13 (Mass. 2007)). Beyond alleging in a conclusory manner that the Company "intentionally interfered with the business relationship by and between NoBs . . . and Datadog," the Counterclaim Complaint proffers no facts suggesting that the second element is plausibly pled. [Countercl. Compl. ¶ 59]. Accordingly, Plaintiffs-in-Counterclaim would also not prevail on this claim.

Chapter 93A creates a private cause of action against those who engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). Section 11 allows a plaintiff to seek damages or injunctive relief against a defendant who has engaged in unfair or deceptive acts in violation of § 2, and requires a plaintiff to establish "(1) that the defendant has committed an unfair or deceptive act or practice; (2) injury; and (3) a causal connection between the injury suffered and the defendant's unfair or deceptive act." Gould v. Bank of N.Y. Mellon, 123 F. Supp. 3d 197, 205 (D. Mass. 2015) (citing Herman v. Admit One Ticket Agency LLC, 912 N.E.2d 450, 454 (Mass. 2009)). Importantly, "[t]o be actionable, the challenged misconduct must rise to the level of an 'extreme or egregious' business wrong" or otherwise "raise[] 'an eyebrow of someone inured to the rough and tumble of the world of commerce.'" Peabody Essex Museum, Inc. v. U.S. Fire Ins., 802 F.3d 39, 54 (1st Cir. 2015) (quoting Baker v. Goldman Sachs & Co., 771 F.3d 37, 49–51 (1st Cir. 2014)).

As an initial matter, "the mere breach of a contract, without more, does not amount to a [Chapter] 93A violation." Zurich Am. Ins. v. Watts Regul. Co., 796 F. Supp. 2d 240, 244 (D. Mass. 2011) (alteration in original) (internal citations omitted). Therefore, to the extent Plaintiffs-in-Counterclaim rely on the breach of contract allegations to support their Chapter 93A claim, their endeavor fails. See Cold Spring Green, LLC v. E. Bos. Sav. Bank, 170 N.E.3d 363, 2021 WL 2589144, at *3 (Mass. App. Ct. June 21, 2021) (a Chapter 93A "claim has no merit if it is wholly derivative of a meritless common-law claim, such as a claim for breach of contract, fraud, or misrepresentation.").[4]

---

[4] Correspondingly, insofar Count IV is derivative of the tortious interference claim, it similarly fails. See, e.g., Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 815 N.E.2d 241, 247 (Mass. 2004) (a Chapter 93A, § 11 claim that is wholly derivative of the tortious interference

11

Moreover, even when taking into account the Cease-and-Desist Letter, the Plaintiffs-in-Counterclaim have alleged no facts from which the Court could conclude that the Company's action rises "to the level of an 'extreme or egregious' business wrong," Peabody, 802 F.3d at 54, or that it had "the rancid flavor of unfairness" as required to adequately plead a Chapter 93A violation, Goldstein v. Enanta Pharm., Inc., 946 N.E.2d 715, 2011 WL 1795282, at *1 (Mass. App. Ct. May 12, 2011). Accordingly, Count IV is dismissed.

### III.     CONCLUSION

For the reasons set forth above, Plaintiff's motion to dismiss, [ECF No. 11], is **GRANTED** without prejudice.[5]

**SO ORDERED.**

December 20, 2024                              /s/ Allison D. Burroughs
                                                                                     ALLISON D. BURROUGHS
                                                                                     U.S. DISTRICT JUDGE

---

claim fails if the evidence is insufficient to establish the tort); MacNeil v. Guenther, No. 1983-cv-01332, 2020 WL 5993142, at *5 (Mass. Super. June 29, 2020); Gelineau v. Bank of N.Y. Mellon, No. 18-cv-12317, 2019 WL 233513, at *2 (D. Mass. Jan. 16, 2019).

[5] Plaintiffs-in-Counterclaim caption their opposition as conditionally requesting leave to amend the Counterclaim Complaint. [ECF No. 15 at 1]. Beyond another mention of seeking to amend Counts I and II in case of dismissal, the Counterclaimants do not expand on the request to amend. [Id. at 4 ("In the alternative, the [sic] if the court is entitled to dismiss the counterclaims sounding in contract, the Defendant be permitted to specify two counts in the nature of a violation of the covenant of good faith and fair dealing by amendment during the pendency of this matter.")]. The "grant or denial of an opportunity to amend is within the discretion of the District Court." Foman v. Davis, 371 U.S. 178, 182 (1962). Here, Plaintiffs have not provided the Court with a proposed amended counterclaim complaint or explained how they intend to cure the pleading defects. See Barricello v. Wells Fargo Bank, N.A., No. 13-12795, 2016 WL 1244993, at *9 (D. Mass. Mar. 22, 2016) ("Ordinarily, a plaintiff's failure to explain the basis for amendment is a sufficient reason to deny leave to amend."). Accordingly, the Court **DENIES** Plaintiffs-in-Counterclaim leave to file an amended Counterclaim Complaint, but **GRANTS** the motion to dismiss without prejudice.